**Harry L. REYNOLDS, Jr., Plaintiff,**

v.

**INTERNATIONAL AMATEUR ATHLETIC FEDERATION, et al., Defendants.**

No. C–2–92–452.

United States District Court, S.D. Ohio, E.D.

June 19, 1992.

David Joseph Young, John Ryan Gall and Philomena M. Dane, Squire, Sanders & Dempsey, Columbus, OH, for plaintiff Harry L. Reynolds, Jr.

Charles Rockwell Saxbe and John Jonas Chester, III, Chester, Hoffman, Willcox & Saxbe, Columbus, OH, and Eugene D. Gulland, Washington, DC, for defendant Intern. Amateur Athletic Federation.

James E. Coleman, Durham, NC, Peter Alkaley, Alkaley, Handler, Robbins & Herman, New York City, for defendant Athletic Congress.

David Greifinger, Santa Monica, CA, for defendants Steve Lewis, Danny Everett and Antonio Pettigrew.

*OPINION AND ORDER*

KINNEARY, District Judge.

This matter comes before the Court to consider the application of the Plaintiff, Harry L. Reynolds, Jr. to convert the Temporary Restraining Order issued on May 28, 1992, and extended on June 8, 1992, into a preliminary injunction. The International Amateur Athletic Federation ("IAAF") has refused to participate in this action, and it has informed Reynolds by letter that its refusal to appear is based upon its belief that this Court lacks personal jurisdiction over it. Notwithstanding the IAAF's absence, this Court conducted an evidentiary hearing on June 17, 1992 to determine whether a preliminary injunction should issue. At the hearing, this Court granted the motion of The Athletics Congress of the U.S.A., Inc. ["TAC"] and three track and field athletes eligible to participate in the United States Olympic trials [1] to intervene as Defendants in this action, and also allowed the United States Olympic Committee to appear as *amicus curiae.*

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff, Harry L. Reynolds, Jr. is a world-class amateur track athlete. He is the current world record holder at the 400 meter distance, and won the silver medal at that distance in the 1988 Olympic games in Seoul, Korea.

This action arises out of Reynolds' appearance in the Herculis '90 International track and field competition ("the Herculis meet") in Monte Carlo, Monaco on August 12, 1990. Following the meet, Reynolds was randomly chosen to submit a urine sample, and on October 18, 1990 he was notified that the sample had tested positive for the anabolic steroid nandrolone. The IAAF immediately suspended Reynolds pending a hearing by Reynolds' national track and field governing body, TAC.[2]

---

1. Those athletes are Steve Lewis, Danny Everett, and Antonio Pettigrew.

2. Conflicting evidence was presented at the hearing with respect to whether Reynolds was "suspended" or declared "ineligible" immediately following the Monte Carlo meet. According to IAAF Rule 59, disciplinary proceedings must occur in three stages: suspension, hearing, and ineligibility. Frank Greenberg, the President of TAC, testified that while an athlete may not participate in track and field events from the moment of suspension, it is only after a hearing and a declaration of ineligibility that the so-called

contamination rule, IAAF Rule 53(ii), becomes applicable.

According to Greenberg, Reynolds was merely suspended by the IAAF immediately upon its receipt of the positive test results from the Monte Carlo meet. However, in a letter from a Doping Control Officer of the IAAF to the Executive Director of TAC, it is declared that "Harry Reynolds is, therefore, *ineligible* to compete under IAAF Rules for a period of 2 years from the date the sample was provided." Pl's Ex. 25 (emphasis added). The Court can only conclude that the IAAF does not exhibit strict adherence to its own rules.

Rather than seek a hearing from TAC, Reynolds sought the intervention of this Court in a case styled *Reynolds v. The Athletics Congress of the U.S.A., Inc., et al.,* No. C–2–91–003, 1991 WL 179760 (S.D.Ohio 1991) (Kinneary, J.) ("Reynolds I") which was before the Court in early 1991. The Complaint in Reynolds I averred that Plaintiff Reynolds was a world-class track and field athlete falsely accused by the IAAF of steroid use and wrongfully suspended from competition for two years—August 12, 1990 to August 11, 1992. On March 19, 1991, this Court held that Reynolds failed to exhaust his administrative remedies and stayed the action pending such exhaustion. On June 11, 1991 the Sixth Circuit Court of Appeals vacated the judgment and ordered the entire case dismissed on the grounds that exhaustion of administrative remedies is a precondition to the exercise of subject matter jurisdiction.[3]

Plaintiff then attempted to exhaust the administrative process available to him. Pursuant to the Amateur Sports Act of 1978, 36 U.S.C. §§ 371–96, and the United States Olympic Committee (USOC) Constitution, Reynolds first participated in an expedited American Arbitration Association proceeding on June 7, 1991. On June 10, 1991, the arbitrator issued a decision essentially exonerating Reynolds on the charge of steroid use:

> The arbitrator finds that the Respondent's suspension of Mr. Reynolds was improper; that there is clear and convincing evidence that the "A" sample and the "B" sample did not emanate from the same person and the "B" sample did not confirm the "A" sample; that there is substantial evidence that neither the "A" sample or the "B" sample emanated from the Claimant; and that Claimant should be declared eligible to compete in the qualifying rounds for the World Game Championships on June 12, 1991.

Complaint Ex. G, Findings and Award of Arbitrator, at 3.

Both TAC and the IAAF refused to accept the arbitrator's decision for the alleged reason that such proceedings are inconsistent with the IAAF's post-suspension administrative adjudication process as provided in IAAF Rule 59. Reynolds' request to the USOC to enforce the decision was denied.

TAC, as the organization required by the IAAF to provide post-suspension administrative adjudication of any dispute, eventually scheduled a hearing for September 13, 1991. After a 12-hour hearing and two weeks of deliberation, the TAC hearing panel announced its decision exonerating Reynolds:

> The panel, after hearing the matters before it, the testimony of witnesses and expert witnesses from both sides, documents and exhibits, hereby finds that Mr. Harry "Butch" Reynolds has cast substantial doubt on the validity of the drug test attributed to him. The panel finds that the "B" sample positive result reported by the Lafarge Laboratory has been impeached by clear and convincing evidence.

Pl's Ex. 20.

The IAAF, however, refused to accepts TAC's finding. Pursuant to its own Rule 20—which provides for the arbitration of disputes between itself and its member associations—the IAAF ordered, on November 17, 1991, an arbitration of the TAC hearing decision. On May 10 and 11, 1992, the IAAF and TAC presented their positions to a three-member arbitration panel. After only two hours of deliberation, the panel issued a seven page decision finding there to be "no doubt" as to Reynolds' guilt.

On May 27, 1992, Reynolds returned to this Court and filed a Verified Complaint along with an application for emergency injunctive relief. The Complaint, which differs from that filed in Reynolds I in that it only names the IAAF as a Defendant, states claims for breach of contract, defamation, tortious interference with a business relationship, and denial of contractual due process.

The next morning this Court held an informal preliminary conference to discuss the possible issuance of a temporary restraining

---

**3.** The Defendant in the current action, IAAF, specially appeared in Reynolds I and moved to have the claims against it dismissed for lack of personal jurisdiction. This Court never had occasion to consider the issue.

order against the IAAF. Although an official representative of the IAAF was not present, counsel for the IAAF in Reynolds I was notified of the conference and did appear to make arguments on the IAAF's behalf, although she expressly informed the Court that she had been unable to contact the IAAF and had not yet been retained to represent the IAAF in the current action. As this Court has already noted, the IAAF thereafter decided not to retain counsel to represent it in this action, and has not made an appearance.

Finding the Plaintiff's application for a temporary restraining order to be meritorious, the Court on May 28, 1992 "restrained and enjoined [the IAAF] from impeding or otherwise interfering with Plaintiff Harry L. Reynolds, Jr.'s participation in all international and national amateur track and field events as a result of or in any manner connected with tests of any sample of urine attributed to him from the August 12, 1990 Herculis '90 International track and field meet in Monte Carlo, Monaco." On June 8, 1992, this Court extended the effect of the restraining order until June 18, 1992. According to Federal Rule of Civil Procedure 65, the temporary restraining order must either be converted into a preliminary injunction or dissolved. Before this Court can consider the merits of a preliminary injunction, however, it must decide whether it may exercise personal jurisdiction over the IAAF.

## I. *PERSONAL JURISDICTION OF THIS COURT OVER THE IAAF* [4]

██ The burden of establishing jurisdiction is on the plaintiff. *Weller v. Cromwell Oil Co.,* 504 F.2d 927 (6th Cir.1974). However, if the district court determines to decide the issue solely on the basis of written materials, the plaintiff need only make a prima facie case of jurisdiction. *Welsh v. Gibbs,* 631 F.2d 436, 438 (6th Cir.1980). This is satisfied where the plaintiff "demonstrate[s] facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Welsh,* 631 F.2d at 438 (quoting *Data Disc,*

*Inc. v. Systems Technology Assocs., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977) (citation omitted)). Under such circumstances, "the burden on the plaintiff is relatively slight, and the district court 'must consider the pleadings and affidavits in the light most favorable to the plaintiff.'" *Welsh,* 631 F.2d at 439 (quoting *Poston v. American President Lines, Ltd.,* 452 F.Supp. 568, 571 (S.D.Fla. 1978) (citation omitted)).

██ For personal jurisdiction to exist over a nonresident defendant in a diversity case, the central concern is the relationship among the defendant, the forum, and the litigation. When presented with a jurisdictional dispute concerning the sufficiency of the defendant's contacts with the forum state, a district court must apply the law of the state in which it sits, subject to constitutional limitations. *Welsh,* 631 F.2d at 439. Thus, two basic prerequisites must be satisfied: the defendant must be amenable to suit under the forum state's long-arm statute and the exercise of jurisdiction over the defendant must not violate the Due Process Clause of the United States Constitution. *In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 224 (6th Cir.1972).

With respect to a defendant's amenability to suit in Ohio, the Ohio Revised Code provides:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

\* \* \* \* \* \*

(3) Causing tortious injury by an act or omission in this state;

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

\* \* \* \* \* \*

---

4. To the extent the allegations in the Complaint and Plaintiff's brief regarding personal jurisdiction are uncontroverted, they must be taken as true. *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984).

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

\* \* \* \* \* \*

(C) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him. O.R.C. § 2307.382. In Ohio, the long-arm statute has been construed to extend the jurisdiction of Ohio's courts to the constitutional limits. *In–Flight Devices,* 466 F.2d at 224–25; *Didactics Corp. v. Welch Scientific Co.,* 291 F.Supp. 890 (N.D.Ohio 1968).

With respect to the "transacting business" provision of the Ohio long-arm statute, subsection (A)(1), the Plaintiff alleges the following jurisdictional facts:

1. "[T]he IAAF makes eligibility determinations regarding athletes and such determinations dramatically affect not only Plaintiff's ability to participate as an 'amateur' athlete, but also his livelihood." Pl's Brief at 19.

2. "The IAAF has controlled Plaintiff's ability to participate in competitions, to seek endorsements, to select an agent, and even to withdraw his own earnings from a trust fund." *Id.*

3. "While controlling athletes, the IAAF, like any sports organization, [ ] relies on athletes to generate income. The IAAF [ ] sponsors a series of championship events which are known as the IAAF World Series and its own Grand Prix circuit ... The IAAF pays for the athletes to attend these events ..." *Id.*

4. "[T]he IAAF contributed to Plaintiff's expenses to insure his participation in the 1987 World Championships and the 1989 IAAF/Mobil Grand Prix Championships." *Id.* at 20.

5. "The IAAF [ ] receives substantial income from television broadcasts of its track and field events including those in which Plaintiff participated." *Id.*

6. "The IAAF [ ] markets books and pamphlets in Ohio by various means, including publication of advertisements in magazines of national circulation, such as Track and Field News." *Id.*

7. "The IAAF also transacted business with Plaintiff through its agent, TAC, and thus jurisdiction exists on that basis as well.... [T]he IAAF, as the international governing body for track and field, operates through its members including TAC. As a member, TAC must abide by all IAAF rules and enforce those rules against its own athlete members, to the extent it is authorized to do so by United States law. Of significance in this case is the IAAF's delegation to TAC the duties of notifying Plaintiff that the IAAF suspended him for a purported doping violation, of conducting a hearing, and of investigating the matter further." *Id.* at 22.

In construing the nearly identical Michigan long-arm provision, the Sixth Circuit declared that the use of the word "any" in the phrase "transaction of any business within the state" means just what it says: "It includes 'each' and 'every'.... It comprehends the 'slightest.'" *Lanier v. American Bd. of Endodontics,* 843 F.2d 901, 906 (6th Cir.1988). In *Lanier,* the Sixth Circuit considered whether the district court could exercise personal jurisdiction over the defendant Board of Endodontics pursuant to the "transaction of any business" provision of Michigan's long-arm statute. In concluding that the court could indeed exercise jurisdiction, the appellate court stated:

The point is that the exchange of correspondence and telephone calls between them including particularly the defendants' activity in mailing the application for Board certification to Dr. Lanier in Michigan, advising her by mail of the requirements for board certification, accepting by mail from Michigan the required registration fees, advising Dr. Lanier of the time, date, and location of the written and oral examinations, sending letters to Michigan advising her that she had been rejected and inviting her to sit for a second oral examination, amounted collectively to the transaction of "any" business in Michigan.

Indeed, the court even conceded that "[t]he Board's contacts in Michigan, insofar as they are pertinent to this case, related entirely to the process of considering Dr. Lanier's request for certification ..." *Id.* at 906.

■ The Court concludes that the Plaintiff has made a prima facie showing that the Defendant IAAF "transacts" business in Ohio. The IAAF makes eligibility determinations with respect to Ohio athletes—including Mr. Reynolds. It arguably enters into a contractual relationship with those athletes—and as averred in the Complaint and presently stands uncontradicted before this Court—it has breached that contract with respect to Mr. Reynolds, causing him significant financial loss. This loss apparently includes the loss of endorsement fees from Ohio corporations. Furthermore, not only does Reynolds receive money from the IAAF to travel from his home in Ohio to IAAF track and field events, the IAAF also receives substantial monies from the broadcast of its meets. Given these, and the other contacts listed above, the Court finds that the IAAF is amenable to suit in Ohio pursuant to the Ohio long-arm statute.

■ With respect to the "tortious activity in Ohio" provision of the long-arm statute, the Plaintiff alleges the following jurisdictional facts:

1. "In his complaint, Plaintiff has alleged that the IAAF defamed him when it falsely announced to the press world wide that Plaintiff used nandrolone.... The defamatory material, the false allegation that Plaintiff used nandrolone, was published in Ohio. The IAAF has issued news releases in Europe through the IAAF Medical Committee Chair, Dr. Arne Ljungqvist, which was carried by Ohio periodicals, including those in Columbus. It was also carried by periodicals such as the New York Times, which are circulated in Ohio." Pl's Brief at 27.

2. "The IAAF is also amenable to suit because it tortiously interfered with Plaintiff's business relationships.... In the case at bar, as a result of the false accusation and Defendant's improper suspension, Plaintiff lost substantial revenues because NIKE terminated an endorsement contract with Plaintiff and declined to proceed with production of a television commercial utilizing Plaintiff. A substantial number of other opportunities for endorsement contracts which were reasonably anticipated to yield significant revenues for Plaintiff were lost because of the suspension. Many of these contracts involved Ohio companies." *Id.* at 27–28.

Again, the Court concludes that the IAAF is amenable to suit in Ohio based upon the tortious activity provisions of the Ohio long-arm statute. The uncontroverted allegations of defamation and interference with business relationships both make out a prima facie case that the IAAF has committed a tortious act which has injured an Ohio resident, and it must reasonably have been expected to do so.[5] Given the uncontroverted nature of the alleged tortious activity and its effect on Mr. Reynolds, the Court finds that the IAAF is amenable to suit in Ohio under Ohio's long-arm statute.

■ Aside from determining whether the IAAF is amenable to suit in Ohio pursuant to the Ohio long-arm statute, this Court must also determine whether the exercise of jurisdiction over the IAAF comports with the dictates of Due Process:

Due Process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In determining whether this standard has been satisfied, this Court is guided by a three-part test adopted by the Sixth Circuit: (1) whether the defendant purposely availed itself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) whether the cause of action arose from the defendant's activities in the forum state; and (3) whether the defendant's

---

5. Indeed, the fact that the IAAF and TAC label their doping-related correspondence "CONFIDENTIAL" evidences their understanding that allegations of drug use will cause serious injury to the reputation of an athlete. Evidence at the hearing, however, suggests that the IAAF published to the world press its conclusion that Reynolds had ingested nandrolone before he was accorded a hearing as provided in the IAAF's own rules.

actions or the consequences of its actions had a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable. *See, e.g., Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968); *In–Flight Devices,* 466 F.2d at 226. This test is not to be mechanically applied, and it does not "eliminate the need to consider the jurisdictional facts of each case individually, to make judgments as to the substantiality of contacts with the forum state and the fairness and justice of subjecting a specific defendant to the in personam jurisdiction of the forum state." *In–Flight,* 466 F.2d at 225–26. Rather, "[i]t is imperative that it be understood that the flexibility, and therein the virtue, of the *International Shoe* test is retained in the third condition and no mechanical consideration of the first two elements of the test can eliminate the need for an appraisal of the overall circumstances of each case if jurisdiction is to be found." *Id.* at 226.

■ The Court believes that it may constitutionally exercise personal jurisdiction over the IAAF. Initially, the Court must sharply reject the IAAF and TAC's position that the IAAF is not subject to the jurisdiction of *any* court *anywhere* in the world. At the hearing, TAC's counsel expressed the view that the IAAF is "infallible" and its decisions must not be reviewable by this Court—or any other. Indeed, IAAF vice president Arne Ljungqvist has been quoted as stating:

Civil courts create a lot of problems for our anti-doping work, but we have said we don't care in the least what they say. We have our rules, and they are supreme ...

Pl's Brief Regarding Personal Jurisdiction of the IAAF, Ex. Y. Apparently, the IAAF takes the position that to accord athletes the individual rights which the United States has always accorded its own citizens is inconsistent with the rules of the IAAF. In a letter from the President of the IAAF to the President of TAC, the former stated:

I realise that you have always honoured our rules and our statutes and that sometimes, as with the Reynolds case, *you find yourself in a dilemma when the American guarantee of individual rights overlaps with your duty, as an IAAF member, to follow our rules,* as has happened in this case with a district court in Ohio. I am however, convinced that regardless of any complication due to national law, you and your colleagues on the TAC Executive Committee will understand the justice of the decisions taken with regards to Reynolds and that you will do everything possible in order to conclude this case within the framework of the IAAF Constitution, in [the] name of the entire world athletics movement.

Pl's Ex. 23, at 2. It is simply an unacceptable position that the courts of this country cannot protect the individual rights of United States citizens where those rights are threatened by an association which has significant contacts with this country, which exercises significant control over both athletes and athletic events in this country, which acts through an agent organization in this country,[6] and which gains significant revenue from its contracts with United States companies.

Regarding the inquiry which this Court must make under the Sixth Circuit's decision in *Southern Machine,* it is manifest that the IAAF has purposefully availed itself of the privilege of acting in Ohio, and has caused

---

6. The Court finds untenable what is apparently the tactic of the IAAF to insulate itself from the jurisdiction of any court: despite the incredible power and influence which it directly wields over track and field athletics in the United States and throughout the world, the IAAF continually maintains that it has no *direct* contact with any country or athlete, and that it only acts or has any outside contact *through* its member organizations, such as TAC. While that may be true, it must then be conceded that TAC is an agent of the IAAF and personal jurisdiction may be found to exist through TAC's contacts with this forum.

*See Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 734 (10th Cir.1984) ("The above evidence constitutes a prima facie showing that the [Federation Internationale de Basketball Amateur] maintains continuous and substantial activity in Colorado through the actions taken on its behalf by its constituent, ABA/USA. Viewed most favorably to Behagen, the record reflects that FIBA *is* its members, and that it governs internationally related amateur basketball through its member organization in each country.").

direct consequences to the Plaintiff in Ohio. This Court has previously listed in detail the facts supporting this conclusion and they will not be recounted here. Suffice it to say, as a general matter, Ohio athletes are subject to the Rules of the IAAF, the IAAF gains substantial revenue from the activities of these athletes, and the IAAF has recognized a track and field event to be held in Ohio. With respect to Mr. Reynolds specifically, the IAAF has contributed expense money so that Mr. Reynolds could compete in two events recognized by the IAAF, has published arguably defamatory statements which were circulated in Ohio publications, and has committed acts which may be found to have tortiously interfered with Mr. Reynolds' business relationships with both United States and Ohio companies.

 Furthermore, this Court believes that as the IAAF acts through its member organizations, it is reasonable to subject the IAAF to jurisdiction anywhere its member organizations may be subject to suit. The evidence before the Court establishes that the IAAF distributes money to athletes through its member organizations, notifies athletes of positive drug test results through its member organizations, and provides adjudication of disputed drug test results in the first instance through its member organizations. Essentially, the IAAF refuses to have any contact with individual athletes, instead forcing such athletes to approach the IAAF through the national organizations. Thus, this Court holds, as the Tenth Circuit held in *Behagen v. Amateur Basketball Ass'n*, that an international organization which acts through its members may be subject to the jurisdiction of a particular court based upon a member's contacts with, and activity in, the forum. Where, as here, the member organization has intervened as a Defendant in the action, the exercise of personal jurisdiction is beyond question.

 Aside from all of the above, the Court holds that the exercise of personal jurisdiction over the IAAF is reasonable, fair, and constitutional because the IAAF has

waived its right to contest the exercise of jurisdiction by this Court. In Reynolds I, the IAAF appeared in the action and moved, as provided in Federal Rule of Civil Procedure 12(b)(2), to dismiss on the grounds that this Court lacked personal jurisdiction over it.[7] In the current action, however, it has apparently decided *sua sponte* that this Court has no jurisdiction over it and that it need not even appear to argue the matter. Thus, the Plaintiff has been denied the ability to obtain discovery from the IAAF in order to support its claim that sufficient contacts exist between the IAAF and Ohio to support this Court's exercise of personal jurisdiction.

 It is axiomatic that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982). This is true because the requirement that a court have personal jurisdiction flows not from Article III of the United States Constitution, but from the Due Process Clause. *Id.* at 702, 102 S.Ct. at 2104. Thus, regardless of the power of a state to serve process, an individual may submit to the jurisdiction of a court by appearance, and a variety of legal arrangements have been found to represent express or implied consent to the personal jurisdiction of a particular court. *See, e.g., National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964) (jurisdiction based on contractual provision); *Petrowski v. Hawkeye–Security Ins. Co.*, 350 U.S. 495, 76 S.Ct. 490, 100 L.Ed. 639 (1956) (jurisdiction based on defendant's stipulation). In sum, "the requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue." *Insurance Corp. of Ireland*, 456 U.S. at 704, 102 S.Ct. at 2105.

Generally, the entitlement to most legal rights is subject to certain procedural rules:

---

**7.** As noted above, the entire action was dismissed before the Court had the opportunity to rule on the IAAF's motion to dismiss.

The failure to follow such rules may well result in the curtailment of the rights. Thus, "the failure to enter a timely objection to personal jurisdiction constitutes, under [Fed. R.Civ.P.] 12(h)(1), a waiver of the objection." *Insurance Corp. of Ireland,* 456 U.S. at 705, 102 S.Ct. at 2105. In that case, the Supreme Court held that a district court may use Federal Rule of Civil Procedure 37(b)(2)(A) [8] to support a finding of personal jurisdiction without violating due process.

In accordance with all of the foregoing and pursuant to Federal Rule of Civil Procedure 12(h)(1) and the Supreme Court's decision in *Insurance Corp. of Ireland,* this Court holds that the IAAF"s failure to enter a timely objection to personal jurisdiction, which failure resulted in the inability of the Plaintiff to obtain the necessary discovery to establish the facts upon which he asserts the jurisdiction of this Court rests, results in the waiver of the IAAF"s right to contest the personal jurisdiction of this Court. Having found the exercise of jurisdiction to be authorized by the Ohio long-arm statute and to comport with the dictates of Due Process, the Court now turns to the merits of the Plaintiff's motion for a preliminary injunction.

## II. *THE PRELIMINARY INJUNCTION*

It is well settled that in order for a preliminary injunction to issue, a plaintiff must establish the following criteria: (1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *International Longshoremen's Ass'n Local 1937 v. Norfolk Southern Corp.,* 927 F.2d 900, 903 (6th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Tyson Foods, Inc. v. McReynolds,* 865 F.2d 99, 101 (6th Cir. 1989); *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *In re De Lorean Motor*

*Co.,* 755 F.2d 1223, 1228 (6th Cir.1985); *USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94 (6th Cir.1982); *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 368 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). The four factors used to determine the efficacy of a preliminary injunction motion are not prerequisites to a successful motion; rather, they are merely elements to be balanced in relation to one another, with no single element being dispositive. *De Lorean Motor Co.,* 755 F.2d at 1229. Thus "the degree of likelihood of success may depend on the strength of the other factors." *Id.* Moreover, the strength of the "likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent the injunction." *Id.* (quoting *Metropolitan Detroit Plumbing & Mechanical Contractors Assn. v. HEW,* 418 F.Supp. 585, 586 (E.D.Mich.1976)); *Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261, 1264 (W.D.Mich.1990). However, where it is shown that the burden imposed upon a defendant by the issuance of a preliminary injunction would be equivalent to that suffered by a plaintiff, the plaintiff must show a strong probability of success on the merits in order to prevail. *Frisch's Restaurant,* 759 F.2d at 1270; *In re De Lorean,* 755 F.2d at 1229; *Schalk,* 751 F.Supp. at 1264. Thus the flexibility traditionally afforded examination of the foregoing factors is tempered by the need to analyze carefully the dynamics of the injury claimed by each of the parties in the case. *Schalk,* 751 F.Supp. at 1264 (citing *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 103 (6th Cir.1982)).

The issue of greatest import to this Court, to the parties, and to *amicus,* is the threat of the IAAF to "contaminate," or in other words, suspend any athlete who competes against Mr. Reynolds knowing that he is currently deemed ineligible to participate in IAAF track and field events. IAAF Rule 53(ii). The Court not only finds the threat

8. Federal Rule of Civil Procedure 37(b)(2)(A) provides that a district court, as a sanction for failure to comply with discovery orders, may enter "[a]n order that the matters regarding which the [discovery] order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order."

unconvincing, it finds it to be an inappropriate consideration to weigh against the harm which will befall Mr. Reynolds if he is wrongfully prevented from participating in track and field competitions due to his IAAF ineligibility status.

The IAAF's threat is unconvincing for several reasons. First, it is not at all clear that IAAF's contamination rule is mandatory in nature. Indeed, documents and testimony adduced at the preliminary injunction hearing cast considerable doubt upon this proposition, and lead this Court to conclude that it is not always strictly enforced. Furthermore, it is equally unclear that the IAAF would attempt to prevent United States track and field athletes uninvolved in this litigation from participating in the Olympics on the basis of Rule 53(ii) alone. The loss of some of the event's top competitors, the resulting public outcry, and the possible loss of substantial revenue to the IAAF, all lead this Court to conclude that widespread "contamination" of American athletes by the IAAF is unlikely.

Even if, however, this Court considered such contamination to be the likely result if an injunction were to issue, the Court finds such a threat *by the Defendant IAAF* to be an entirely inappropriate consideration. It is, of course, axiomatic that in considering the merits of a preliminary injunction, the Court must consider whether the injunction will harm others. However, it is the impassioned conviction of the Court that such harm to others does not, and indeed, should not, include harm to others *caused by the voluntary and intentional acts of the Defendant.* To hold otherwise would be to allow the IAAF to hold the entire American Olympic team hostage against an unfavorable decision from this Court. While it remains possible that the IAAF and its members will attempt—and may even succeed—in rendering various American athletes ineligible for

participation in the 1992 Summer Olympic Games, this Court finds such a threat to be inapposite to the issue at hand, and further finds the IAAF rule underlying the threat to be a grossly unsavory method of enforcing its anti-doping rules and avoiding interference in its affairs by this Court and others.

This Court also believes that Reynolds has established a likelihood of success on the merits of his claims. With respect to the validity of the drug test performed at the Lafarge Laboratory on the urine sample provided by Reynolds in Monte Carlo, this Court believes—as did the American Arbitration Association arbitrator and the TAC hearing panel—that Reynolds has created a substantial doubt as to the accuracy of the reported results. Not only did Reynolds' expert testify as to numerous deficiencies in the Lafarge Laboratories' testing procedure,[9] he also testified as to several inconsistencies with the actual test results which make it highly unlikely that both samples actually originated with Mr. Reynolds.[10] Finally, and perhaps most egregious of all, Plaintiff's expert testified that nandrolone is known to remain in an individual's body for a considerable period of time, and the fact that Reynolds' urine allegedly tested positive for two metabolites of nandrolone on August 12, 1990, and tested negative for nandrolone one week later on August 19, 1990, casts considerable doubt on the validity of the August 12 test.

With respect to the claims in Reynolds' Complaint, the Court finds it likely that they are meritorious. First, it appears likely that a contractual relationship exists between the Plaintiff and both the IAAF and TAC, and it further appears that the IAAF breached this contract when it departed from its own guidelines and regulations regarding appropriate drug testing procedures. Second, it appears likely that the IAAF—with disregard for its own policy of confidentiality—maliciously released to the world media infor-

---

9. For instance, Plaintiff's expert testified that the laboratory failed to attach proper chain of custody documentation to the urine samples provided by Reynolds, failed to use an "internal standard" to assist it in interpreting the results, and failed to use a positive quality control.

10. Plaintiff's expert testified that the "picture" of naturally occurring steroids should be relatively the same for both samples of urine if, as alleged, they were both supplied by Reynolds. He concluded, however, that because the naturally occurring steroids in the two samples created extremely different "pictures", the two could *not* have originated with the same individual.

mation that Reynolds had tested positive for the steroid nandrolone *before* Reynolds was accorded a hearing before TAC as prescribed by IAAF rules. It is reasonable to infer that the IAAF knew that such information would cause third parties to void existing endorsement contracts and prevent others from entering into such contracts. As such, Reynolds is likely to succeed on his claim of defamation and tortious interference with a business relationship. *See Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 379 N.E.2d 235 (Summit Co.1977).

 Even were this Court not convinced of the likelihood that Reynolds will succeed on the merits of his claims, the fact that significant harm will befall Reynolds if the injunction is not issued weighs heavily in favor of granting the motion. As noted above, the strength of the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent the injunction. In other words, because this Court finds that Reynolds will suffer significant and irreparable harm if not allowed to participate in the Olympic trials, the Court need not be as diligent in considering the likelihood of success on the merits of his claims.

 Finally, the Court notes that even if, after a trial on the merits of this case, it turns out that Reynolds does not succeed, little or no irreparable harm will have occurred. Because track events result in rank-ordered results, even if Reynolds places in a qualifying position and it later appears that he must be disqualified, he may simply be removed from the qualifying position and another athlete may be elevated to his position.

In sum, the Plaintiff has established that, in the absence of a preliminary injunction, he will be irreparably harmed, and the harm suffered by Plaintiff outweighs any harm others may suffer. Plaintiff has also established that the public interest will be furthered, and he is likely to succeed on the merits. Therefore it is hereby **ORDERED** and **DECREED** that:

(1) Plaintiff's Motion for a Preliminary Injunction is **GRANTED;**

(2) Defendants IAAF and TAC, their agents, members, officers, attorneys, servants, employees, and any and all other persons who act in concert or participation with the Defendants or who act upon the order or direction of the Defendants or in place of the Defendants who receive actual notice of this Order are hereby restrained and enjoined from interfering, impeding, threatening to impede or interfere, in any way the Plaintiff's ability to compete in all international and national amateur track and field competitions, including, but not limited to the 1992 United States Olympic Trials and 1992 Summer Olympic Games as a result of or in any manner connected with tests on any sample of urine attributed to him from the August 12, 1990 Herculis '90 International Track and Field Meet in Monte Carlo, Monaco;

(3) Defendants IAAF and TAC, their agents, members, officers, attorneys, servants, employees, and any and all other persons who act in concert or participation with the Defendants or who act upon the order or direction of the Defendants or in place of the Defendants who receive actual notice of this Order are hereby restrained and enjoined from threatening to suspend or contaminate and from suspending or contaminating any athlete who competes with Plaintiff;

(4) Defendants IAAF and TAC, their agents, members, officers, attorneys, servants, employees, and any and all other persons who act in concert or participation with the Defendants or who act upon the order or direction of the Defendants or in place of the Defendants who receive actual notice of this Order are hereby restrained and enjoined from threatening to contaminate or suspend Plaintiff and from suspending or contaminating Plaintiff as a result of Plaintiff's participation in any track and field competition, including those competitions in which Plaintiff participated pursuant to this Court's Temporary Restraining Orders of May 28, 1992, and June 8, 1992; and

(5) Defendants IAAF and TAC, their agents, members, officers, attorneys, servants, employees, and any and all other persons who act in concert or participation with the Defendants or who act upon the order or direction of the Defendants or in place of the Defendants who receive actual notice of this Order are hereby restrained and enjoined from threatening to suspend or contaminate and from suspending or contaminating any other athlete who participated or competed with Plaintiff pursuant to this Court's Temporary Restraining Orders of May 28, 1992, and June 8, 1992.

This Order shall continue in effect until the trial on the merits of the Plaintiff's claims.

Plaintiff's bond in the amount of $100.00 posted in connection with the Temporary Restraining Order shall remain with the Clerk of this Court.

**IT IS SO ORDERED.**